## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION, YOUNGSTOWN

| | |
|---|---|
| ROSEMARY MOZUCH, CHARLES MOZUCH, JAMES SALING, JERRIE DAUGHERTY, CHARLOTTE BOWERS, and WILLIAM BOWERS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY,<br><br>        Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Rosemary Mozuch, Charles Mozuch, James Saling, Jerrie Daugherty, Charlotte Bowers, and William Bowers (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned counsel, bring this Class Action Complaint against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (together, "Norfolk Southern" or "Defendants"). The following allegations are based upon investigation by Plaintiffs' counsel and upon personal knowledge as to Plaintiffs' specific allegations.

### NATURE OF THE ACTION

1.      On February 3, 2023, at approximately 9:00 p.m., a Norfolk Southern freight train, Train 32N, derailed in East Palestine, Ohio, close to the Pennsylvania border.

2.      Train 32N was transporting dangerous and combustible carcinogenic chemicals, including polyvinyl, polyethylene, butyl acrylates, ethyhexyl acrylate, ethylene glycol monobutyl ether, and vinyl chloride.

3.      The derailment caused the release of over a million pounds of dangerous chemicals into the atmosphere, which has contaminated the air, soil, water, and property of the local residents.

4.      The chemicals created plumes of thick noxious smoke that spread through East Palestine and neighboring towns.

5.      The heat from the fire caused safety valves on the pressurized tanks storing vinyl chloride to open, venting vinyl chloride into the atmosphere.

6.      Fearing explosions of tanks, government officials in Ohio and Pennsylvania ordered an immediate evacuation of the vicinity within a mile of the derailment.

7.      Norfolk Southern decided to "vent and burn" vinyl chloride by puncturing holes in the vinyl chloride containers, allowing the chemical to discharge, and then lit the chemical on fire creating a chemical inferno that burned for days smothering local properties in toxic black smoke.

8.      Plaintiffs and members of the Class defined below have been exposed to toxic chemicals, forcing some Class members to relocate from their homes.

9.      Local wildlife and livestock have been poisoned, and residents have been injured from inhaling toxic fumes.

10.     Businesses in the surrounding communities and neighborhoods were closed.

11.     The toxic chemicals covered the homes and crops of Class members and seeped through the soil contaminating groundwater.

12.     The properties of Class members, including Plaintiffs, have suffered significant loss of economic value due to the contamination of well-water and soil and proximity to this environmental catastrophe.

13.     Plaintiffs and Class members have and will continue to suffer decreased property values, damage to personal property, and lost wages.

14.     Accordingly, Plaintiffs bring this class action lawsuit to seek relief from Defendants for their irresponsible and tortious conduct.

## PARTIES

15.     Plaintiff Rosemary Mozuch is a resident and citizen of Darlington, Pennsylvania. Ms. Mozuch owns residential property that uses well water in Darlington, Pennsylvania and is a member of the Class defined below.

16.     Plaintiff Charles Mozuch is a resident and citizen of Darlington, Pennsylvania. Mr. Mozuch owns residential property that uses well water in Darlington, Pennsylvania and is a member of the Class defined below.

17.     Plaintiff James Saling is a resident and citizen of East Liverpool, Ohio, Columbiana County. Mr. Saling owns residential property in Columbiana County and is a member of the Class defined below.

18.     Plaintiff Jerrie Daugherty is a resident and citizen of East Liverpool, Ohio, Columbiana County. Ms. Daugherty owns residential property in Columbiana County and is a member of the Class defined below.

19.     Plaintiff Charlotte Bowers is a resident and citizen of East Palestine, Ohio. Ms. Bowers rents her home within the evacuation zone and is a member of the Class defined below.

20.     Plaintiff William Bowers is a resident and citizen of East Palestine, Ohio. Mr. Bowers rents his home within the evacuation zone and is a member of the Class defined below.

21.     Defendant Norfolk Southern Corporation ("NSC") is a corporation formed in Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia.

22.     Defendant Norfolk Southern Railway Company ("NSRC") is a wholly owned subsidiary of NSC. NSRC is a corporation formed in Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia.

23.     Defendants jointly own and operate the Norfolk Southern railway and are responsible for the toxic events alleged herein.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because at least one member of the Class is a citizen of a state different from any Defendant; there are more than 100 Class members; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

25.     This Court has jurisdiction over Defendants as Defendants transact business in the State of Ohio for which they receive substantial revenue. Based on their tortious conduct within Ohio, Defendants expected, or should have expected, that their acts would have consequences within Ohio.

26.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims of Plaintiffs and the Class occurred in this District.

## FACTUAL ALLEGATIONS

27.     On Friday, February 3, 2023, Norfolk Southern Freight Train 32N ("Freight Train 32N") was traveling northeast from Madison, Illinois to Conway, Pennsylvania.

28.     Freight Train 32N was transporting hazardous chemicals including hundreds of thousands of pounds of polyvinyl, polyethylene, butyl acrylates, ethylhexyl acrylate, ethylene

glycol monobutyl ether, benzene, and vinyl chloride, a toxic flammable gas and known carcinogen. Etyhexyl acrylate and benzene are also considered to be carcinogens by the EPA.

29.    Approximately 20-40 minutes before reaching the derailment site, an overheated wheel bearing on the train car sparked and the train caught fire. The train continued to travel ablaze toward East Palestine.

30.    A "hotbox" detector in Salem, Ohio, should have detected this activity and alerted the crew, but it is not known if this occurred.

31.    At approximately 9:00 p.m., a mechanical defect alarm sounded on Freight Train 32N, alerting the crew to a mechanical issue. The train crew applied the emergency brake in East Palestine, Ohio, derailing thirty-eight of the 141 cars of Freight Train 32N.

32.    When the cars derailed, hundreds of thousands of pounds of polyvinyl, ethylhexyl acrylate, ethylene glycol monobutyl ether, butyl acrylates, and petroleum spilled, igniting a massive chemical fire.

33.    The fire and chemicals created a toxic inferno of thick billowing smoke that enveloped and poisoned the land, water, and soil in the surrounding communities, and the properties of the residents who resided there.

34.    Defendants failed to extinguish the fire.

35.    As the blaze continued to increase the heat and pressure inside the vinyl chloride railcars, government officials in Ohio began to fear that the vinyl chloride railcars could explode, causing a deadly disbursement of uncontrolled shrapnel.

36.    Ohio Governor Mike DeWine issued a news release warning of the potential deadly explosion and ordering residents within a one-mile radius of the derailment site to immediately evacuate.

37.     Norfolk Southern decided to conduct a "controlled release" of the vinyl chloride by puncturing holes in the vinyl chloride railcars.

38.     Upon information and belief, this "controlled release" by Defendants discharged over a million pounds of cancer-causing vinyl chloride, phosgene, and hydrogen chloride into the environment. Defendants then set the toxic chemicals on fire.

39.     The chemical fire burned for days, covering the properties of Plaintiffs and the Class in a plume of thick black smoke and dispersing toxic chemicals into the air, soil, and waters, far beyond the borders of East Palestine, Ohio.

40.     Vinyl chloride is a human carcinogen. Burning vinyl chloride creates phosgene, a poisonous gas used as a chemical weapon during World War I.

41.     Exposure to vinyl chloride can cause dizziness, fatigue headaches, respiratory tract irritation, wheezing, chemical bronchitis, nausea, vomiting, and diarrhea. Chronic exposure to the chemical can cause permanent liver injury, liver cancer, and neurologic or behavioral symptoms.

42.     On Monday, February 6, 2023, Ohio Governor Mike DeWine and Pennsylvania Governor Josh Shapiro jointly issued an evacuation order for approximately 2,000 residents within a one-by-two-mile radius of the train wreck. The evacuation zone included parts of Western Pennsylvania.

43.     Residents outside of the evacuation zone were advised to shelter in place during the vinyl chloride vent and burn.

44.     Plaintiffs and the Class were exposed to toxic substances and fumes as a result of Defendants' tortious actions and will continue to require medical monitoring based on the increased threat of physical harm to their health.

45.     Local residents on social media and news reports reported that fish, frogs, and other animals were dying in local streams, and images of dead animals in the days following the derailment were published and shared.

46.     On February 14, 2023, state officials acknowledged that the chemical spill had killed approximately 3,500 fish and reached the Ohio River.

47.     Despite the serious dangers posed by the toxic chemicals spewing from the wreckage, Defendants failed to immediately report the trainwreck as required by federal law and did not report the trainwreck to federal authorities until approximately 10:53 p.m., nearly two hours after the wreck.

48.     As federal, state, and local emergency response teams arrived, Norfolk Southern continued to leave authorities in the dark, making unilateral decisions without input from key agencies.

49.     For example, Norfolk Southern failed to provide first responders with key information about the chemicals onboard the wrecked train, leaving them unable to determine how to safely extinguish the fire while it grew out of control.

50.     Norfolk Southern then failed to disclose to state and local agencies the true impact of the proposed vent and burn including the number of railcars that contained dangerous chemicals.

51.     Norfolk Southern also failed to explore reasonable alternatives for the vent-and-burn plan, motivated by a desire to re-open the rail line as quickly as possible. The vent-and-burn strategy allowed Norfolk Railway to reopen on February 8, 2023, just five days after the trainwreck.

52.     Instead of cleaning up the debris from the trainwreck, Norfolk Southern spent its time getting the railway up and running again, opting to simply cover and fill the contaminated soil.

53.     Norfolk Southern has still not cleaned up and remediated all soil contaminated by the hazardous chemicals and toxic events that it caused.

54.     Norfolk Southern puts profits over safety. For example, in 2017, Norfolk Southern blocked a shareholder initiative requesting its board of directors "issue a report describing current company efforts to assess, review, and mitigate risks of hazardous material transportation[.]" Norfolk Southern dismissed the initiative as an attempt to "micro-manage the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment."

55.     Had Norfolk Southern heeded its shareholders' warning and taken efforts to improve the company's safety measures, the toxic events alleged herein could have been avoided.

56.     Instead, Plaintiffs and Class members are suffering from toxic exposures and reporting symptoms such as headaches, rashes, respiratory injuries, among others, as well as economic injuries.

57.     On February 6, 2023, the EPA particulate pollution monitor in Youngstown, Ohio, over 23 miles from the derailment site, registered at more than triple the normal amount of ambient particulate matter. Three days later, the particulate levels in Youngstown were five times higher than they were prior to February 6.

58.     The EPA has also detected hazardous chemicals from the derailment and reported that the trainwreck has contaminated local groundwater, including streams, and the Ohio River, which provides drinking water for over five million people.

59.     Local residents have been advised to drink only bottled water, especially if their water is from a well.

60.     The discharge of one million pounds of vinyl chloride into the atmosphere has affected thousands of residents in Ohio and Pennsylvania and will have a lasting disastrous effect on the water, soil, air, and public health.

## PLAINTIFFS' FACTUAL ALLEGATIONS

61.     Plaintiffs Charles and Rosemary Mozuch, husband and wife, are residents of Darlington, Pennsylvania, own residential property that uses well water, and have suffered a decrease in the market value of their property as a result of the toxic events alleged herein caused by Defendants.

62.     Plaintiffs James Saling and Jerrie Daugherty, an engaged couple, are residents of East Liverpool, Ohio, own residential property, and have suffered a decrease in the market value of their property as a result of the toxic events alleged herein caused by Defendants.

63.     Plaintiffs William Bowers and Charlotte Bowers, husband and wife, are residents of East Palestine, Ohio, rent residential property, and have suffered economic losses from being evacuated from their home and having to stay in motels during the evacuation period. Mr. Bowers has COPD and has experienced an increase in shortness of breath, sore throat and bloody nose since the derailment and toxic burn while Charlotte is experiencing chest congestion. They have paid out of pocket to stay in a motel, and purchase water and meals.

64.     As a direct and proximate result of Defendants' tortious acts and omissions that led to the trainwreck and chemical burn pit, Plaintiffs have suffered significant economic damages including damage to property, loss of property value, and loss of the use and enjoyment of their property.

## CLASS ALLEGATIONS

65.     Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all similarly situated persons harmed by Defendants' February 3, 2023 train derailment, fire, and subsequent chemical burn pit and toxic emissions and environmental pollution. Plaintiffs bring this action on behalf of:

> all individuals who resided in, leased, or owned property within a thirty (30) mile radius of the derailment site in East Palestine, Ohio, as of February 3, 2023 (the "Residential Property Class").

66.     To the extent that there are differences in state law between Ohio law and Pennsylvania law that are ultimately held to apply at the class certification stage following discovery, Plaintiffs James Saling, Jerrie Daugherty, William Bowers, and Charlotte Bowers bring this action as proposed class representatives on behalf of:

> all individuals who resided in, leased, or owned property within a 30-mile radius of the derailment site in East Palestine, Ohio, as of February 3, 2023, and live in the State of Ohio (the "Ohio Subclass").

67.     To the extent there are differences in state law between Ohio law and Pennsylvania law that are ultimately held to apply at the class certification stage following discovery, Plaintiffs Charles and Rosemary Mozuch bring this action as proposed class representatives on behalf of:

> all individuals who resided in, leased, or owned property within a 30-mile radius of the derailment site in East Palestine, Ohio, as of February 3, 2023, and live in the Commonwealth of Pennsylvania (the "Pennsylvania Subclass").

68.     The Residential Property Class, Ohio Subclass, and Pennsylvania Subclass are collectively referred to herein as the "Class" and each meet all requirements for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure as set forth below.

69.     Excluded from the Class are (a) Defendants and their affiliates, parents, subsidiaries, and employees; (b) claims for personal or bodily injuries; and (c) the judges and mediators assigned to this case, their immediate families, and court staff.

70.     Plaintiffs reserve the right to modify and amend the Class definition after having an opportunity to conduct additional investigation and discovery.

71.     <u>Numerosity</u>. This Class meets the requirements of FED. R. CIV. P. 23(a)(1) as the members of the Class are numerous, including thousands of individual members, such that joinder of all members in a single action is impractical. Class members can be readily ascertained via their geographic location, and identified by property records and other public records, such that they can be notified of this action through standard methods.

72.     <u>Commonality and Predominance</u>. The Class meets the requirements of FED. R. CIV. P. 23(a)(2) and (23)(b)(3) because this action for economic damages involves common questions of law and fact that predominate over any individual issues affecting Class members. Common questions of fact and law include, for example and without limitation:

    a.     Whether Defendants caused the trainwreck;

    b.     Whether Defendants caused the dispersal of toxic chemicals and environmental contamination of the surrounding air, water, soil, and property;

    c.     Whether Defendants caused property values to diminish in the affected geographic region;

    d.     The extent of property damage and other economic damages caused by the trainwreck;

    e.     Whether Defendants created a public nuisance;

    f.     Whether Defendants created a private nuisance;

11

g.      Whether Defendants caused a trespass to the property of Plaintiffs and the Class;

h.      Whether Plaintiffs and the Class members are entitled to medical monitoring and early detection of disease;

i.      Whether Defendants breached duties owed to Plaintiffs and the Class;

j.      Whether Defendants breached its duties in transporting ultra-hazardous materials;

k.      Whether Defendants breached its duties to warn Plaintiffs and the Class of the long-term health consequences of exposure to the toxic chemicals that were emitted as a result of the trainwreck;

l.      Whether Plaintiffs and the Class are entitled to medical monitoring to facilitate early detection of diseases known to be associated with the toxic chemicals released into the air, water, and soil as a result of Defendants' conduct;

m.      The appropriate nature of class-wide equitable relief;

n.      The amount of economic damages owed to Plaintiffs and the Class;

o.      The appropriate measurement of restitution and/or measure of damages or relief to the Class;

p.      Whether Defendants acted recklessly or intentionally with respect to their actions that caused the trainwreck; and

q.      Whether Defendants are liable to Plaintiffs and the Class for punitive damages resulting from the trainwreck.

73.      <u>Typicality</u>. The Class meets the requirements of FED. R. CIV. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the members of the Class, as they all arise from the

same wrongful conduct by Defendants. All Plaintiffs and Class members have been economically injured by the same wrongful conduct by Defendants and all claims are based on the same legal theories.

74. <u>Adequacy of Representation</u>. This Class meets the requirements of FED. R. CIV. P. 23(A)(4) because Plaintiffs are representatives who will fully and adequately represent and protect the interests of the Class members and have retained the undersigned counsel who are experienced and qualified in prosecuting complex toxic tort class actions. Neither Plaintiffs nor their attorneys have interests adverse to or in conflict with those of the Class members.

75. <u>Injunctive and Declaratory Relief</u>. The elements of FED. R. CIV. P. 23(b)(2) are met here. Plaintiffs and the Class remain at an unreasonable and serious safety risk because of Defendants' conduct alleged herein. Defendants have acted and refused to act on grounds that apply generally to the Class, such that preliminary and final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

76. <u>Superiority</u>. Pursuant to FED. R. CIV. P. 23(b)(3), a class action is appropriate here and superior to all other means for adjudicating this controversy. Defendants' conduct as alleged herein and their breaches of duties are generally applicable to Plaintiffs and the Class. Litigating each of the thousands of Class members' claims individually is inefficient, time consuming and extremely costly and has the potential for inconsistent judgments. Further, the economic damages incurred by individual Class members may be relatively small making the expense and burden of individual litigation burdensome and inefficient. A class action is superior to other available means for adjudication because it will allow for consistency, presents fewer case management difficulties, and will conserve time and resources.

## CAUSES OF ACTION

### COUNT I:
### NEGLIGENCE

77.     Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

78.     Defendants had duties under federal and state law to use reasonable care in transporting hazardous and toxic chemicals by train, including, without limitation:

       a.     Ensuring proper safety procedures;

       b.     Regularly inspecting its railways and railcars;

       c.     Ensuring all systems for monitoring malfunctions work properly;

       d.     Preventing derailments;

       e.     Preventing chemical spills and toxic pollution events;

       f.     Preventing the mechanical malfunction of their equipment;

       g.     Ensuring proper mechanisms for stopping malfunctioning railcars without derailment;

       h.     Loading railcars consistent with accepted practices;

       i.     Properly staffing trains and railcars;

       j.     Properly hiring, instructing, training, managing, and supervising all train personnel, including engineers, dispatch operators, agents, and employees in all respects, including during emergencies;

       k.     Ensuring the proper handling of a railcar's mechanical malfunction;

       l.     Ensuring that proper procedures are in place to identify and address a fire on a railcar;

       m.     Ensuring that proper procedures are put into place and implemented for deploying the emergency brake in the event of a mechanical malfunction or fire;

n.      Ensuring that proper procedures are into place and implemented in the event of a derailment;

o.      Safely transporting dangerous chemicals so as not to cause harm to residents and those near the train, who are foreseeable victims of a train accident such as the one that occurred here;

p.      Safely disposing of ultra-hazardous materials without exposing Plaintiffs and Class members to carcinogenic chemicals;

q.      Adequately and accurately warning those who have been exposed to toxic chemicals of the risk of catastrophic injury and illness from exposure to those chemicals; and

r.      Containing the spread of hazardous chemicals from polluting air, water, soil, and property.

79.      Defendants breached all of these duties that they owed to Plaintiffs and the Class, including, without limitation, by:

a.      Failing to ensure proper safety procedures;

b.      Failing to regularly inspect their railway and railcars;

c.      Failing to ensure that their systems for monitoring malfunctions worked properly;

d.      Failing to prevent the derailment and resulting toxic chemical spills and emissions;

e.      Failing to prevent the mechanical malfunction of equipment;

f.      Failing to ensure proper mechanism(s) for stopping malfunctioning railcars without derailment and fire;

g.      Failing to load railcars consistent with accepted practice;

15

h.      Failing to properly staff and supervise its railcars;

i.      Failing to properly hire, instruct, train, manage, and supervise, their personnel, including, without limitation, their train engineers, dispatch operators, agents and employees, that were responsible for the trainwreck and resulting toxic events described herein;

j.      Failing to ensure the proper handling of a railcar's mechanical malfunction;

k.      Failing to ensure that proper procedures were in place to identify and address a fire on a railcar;

l.      Failing to ensure that proper procedures were in place and implemented for deploying the emergency brake;

m.      Failing to ensure that proper procedures were in place and implemented in the event of a derailment;

n.      Failing to ensure that proper procedures were in place and implemented in the event of a fire;

o.      Failing to safely transport dangerous chemicals so as not to cause harm to Plaintiffs and the Class who were foreseeable victims of Defendants' conduct;

p.      Failing to safely dispose of hazardous materials without exposing Plaintiffs and the Class carcinogenic chemicals and agents;

q.      Failing to prevent chemical release from its railcars;

r.      Failing to adequately and accurately warn of the risk of catastrophic injury and illness from exposure to hazardous and carcinogenic chemicals;

s.      Failing to contain the spread of hazardous chemicals from polluting the air, water, soil, and property of Plaintiffs and the Class; and

t.     Failing to institute proper procedures for timely notifying governmental authorities of a derailment.

80.     Defendants owed Plaintiffs and the Class and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, an abnormally dangerous and ultra-hazardous activity.

81.     Defendants owed Plaintiffs and the Class and breached a duty of reasonable care commensurate with the release and burning of hazardous chemicals, including the resultant release of phosgene and hydrogen chloride into the air, water, and soils.

82.     All economic injuries of Plaintiffs and the Class as a result of the trainwreck described herein were directly and proximately caused by Defendants' conduct in the course of conducting its abnormally dangerous activity, including their failure to properly mitigate the dangers associated with its train operations.

83.     As a direct and proximate result of Defendants' release of hazardous materials throughout a thirty (30) mile radius of the derailment site, the property of Plaintiffs and the Class were, and are, being physically invaded by the toxic discharges that occurred.

84.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered property damages, including physical injury to their property, and diminution of value of their property, as corroborated by the presence of odor, visible mists, and droplets on properties.

85.     Complete environmental remediation by Defendants is imperative, as residents have already reported suffering from physical health symptoms, including nausea, headaches, vomiting, dizziness, light-headedness, and nosebleeds, and long-term health effects from the toxic chemicals that were emitted are well-documented in the literature.

86.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer from diminution of value of real estate, property damage, the cost of environmental clean-up and remediation to repair and restore property to its prior non-contaminated condition, and the loss of the quiet use and enjoyment of their properties. In addition, Class members have incurred further economic damages in the form of relocation costs and costs incurred to purchase bottled water.

87.     Defendants acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and the Class so as to warrant imposing punitive damages.

## COUNT II:
## STRICT LIABILITY

88.     Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

89.     Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the Restatement (Second) of Torts §§ 519–520.

90.     The transportation of the toxic and flammable chemicals described above is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in the Restatement (Second) of Torts §§ 519–520.

91.     Defendants engaged in an abnormally dangerous and ultrahazardous activity for which common law strict liability applies.

92.     As a direct and proximate cause of Defendants' abnormally dangerous and ultrahazardous activity, Plaintiffs' properties have been affected and contaminated with environmental pollution, including, without limitation, dangerous levels of toxic and/or carcinogenic substances.

93.     As a direct and proximate cause of Defendants abnormally dangerous and ultrahazardous activity, Plaintiffs suffer, and will continue to suffer from diminution of value of real estate, property damage, the cost of environmental clean-up and remediation to repair and restore property to its prior non-contaminated condition, and the loss of the quiet use and enjoyment of their properties. In addition, Class members have incurred further economic damages in the form of relocation costs and costs incurred to purchase bottled water.

94.     Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages suffered by Plaintiffs and the Class, which were the direct and proximate result of the train derailment, release, and burn of hazardous substances by Defendants as described above.

95.     Defendants acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and the Class so as to warrant imposing punitive damages.

## COUNT III:
## TRESPASS

96.     Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

97.     Defendants knew or should have known that the hazardous and toxic chemicals that they transported, released, and ignited were dangerous to people, animals, and real and personal property. It was substantially certain that the emission, discharge, disposal, distribution, spread, and/or release of these toxic substances would injure Plaintiffs and their property, and cause them to incur economic damages.

98.     Defendants intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass to Plaintiffs' properties by discharging, through the trainwreck and resulting fires, pollutants and toxic chemical into the air, water, and soil, knowing that those toxins could contaminate the property and drinking water of Plaintiffs and Class members.

99.     Defendants intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass to Plaintiffs' properties by disposing of waste and chemicals in a manner they knew was substantially likely to cause hazardous material to contaminate Plaintiffs' properties.

100.    Defendants showed deliberate indifference to and disregard for Plaintiffs and Class members' rights to their land and property.

101.    Defendants' trespass has and will continue to interfere with Plaintiffs' rights to use and enjoy their property, to avail themselves to their property's value as an asset, and/or source of collateral for financing, and to use their property in the manner that Plaintiffs and Class members so choose.

102.     As a direct and proximate result of Defendants' trespass, Plaintiffs and Class members have suffered injury and damages in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to clean and repair the damage and restore the property to its pre-trespass condition, the costs of recovering possession of the property, business losses, and the value of their lost use of the property as a result of Defendants' ongoing trespass.

103.    Defendants acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and the Class so as to warrant imposing punitive damages.

**COUNT IV:**
**PRIVATE NUISANCE**

104.    Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

105.    At all times relevant hereto, Defendants knew or should have known that the toxic chemicals that were emitted as a result of the trainwreck, including, without limitation, vinyl

chloride, butyl acrylate, benzene residue, phosgene, and hydrogen chloride were hazardous and harmful to human beings and to Plaintiffs' and Class members' real property.

106.     At all times relevant hereto, Defendants knew or should have known that igniting and discharging toxic carcinogenic chemicals would create conditions harmful to health and interfere with the comfort and enjoyment of life and property by Plaintiffs and the Class.

107.     Defendants' trainwreck and discharge of toxic chemicals substantially interfered with the rights of Plaintiffs and the Class to use and enjoy their property, causing them to suffer injuries as alleged herein. Defendants' conduct has caused Plaintiffs to use contaminated water to drink, cook, irrigate gardens, and/or provide water to pets and livestock, or alternatively, to relocate and/or have to purchase water from other sources.

108.     Defendants' conduct has interfered with Plaintiffs' ability to enjoy their property, decreased and diminished the value of their land and property, interfered with their ability to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose.

109.     Defendants' actions described herein were unreasonable, were an invasion of Plaintiffs' property rights, and constitute a private nuisance, for which Plaintiffs did not consent.

110.     Plaintiffs and the Class, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct including the contamination and invasion of their land, property, and water.

111.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members have suffered injury and damages as stated above in an amount to be proven at trial, including, without limitation, property damage, diminution of value of real estate, the cost to clean and repair the damage and restore their property to its previous condition, the cost of recovering

21

possession of the property, and the value of their lost use of the property as a result of Defendants' conduct.

112.    Defendants acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and Class members so as to warrant imposing punitive damages.

**COUNT V:**
**PUBLIC NUISANCE**

113.    Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

114.    At all times relevant hereto, Defendants knew or should have known that the hazardous chemicals it was transporting, and their byproducts if ignited, were hazardous to human beings and property.

115.    Defendants knew or should have known that improper transportation, handling, and disposal of toxic chemicals would injure people in the surrounding communities.

116.    Plaintiffs and the Class have a right to enjoy their real property free from dangerous contamination, to breathe clean air, to have access to clean running water without dangerous levels of toxic chemicals, and to live their lives without unreasonable exposure to toxic and/or carcinogenic chemicals.

117.    As a direct and proximate result of Defendants' negligent, reckless, and/or intentional mishandling and disposal of toxic and carcinogenic chemicals, Plaintiffs' and Class members' rights to enjoy their property was substantially diminished.

118.     As a direct and proximate result of Defendants' negligent, reckless, or intentional mishandling and disposal of toxic and carcinogenic chemicals, Plaintiffs' and the general public's common right to breathe clean air and have access to clean running water, was severely diminished or entirely eliminated.

119.    Defendants' conduct has interfered with Plaintiffs' ability to enjoy their property, decreased and diminished the value of their land and property, interfered with their ability to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose.

120.    Defendants acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and Class members so as to warrant imposing punitive damages.

**COUNT VI:**
**STATUTORY NUISANCE**

121.    Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

122.    Vinyl chloride is considered a hazardous air pollutant pursuant to Section 112 of the federal Clean Air Act, which sets a national emission standard. 41 Fed. Reg. 46560.

123.    Pursuant to the Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6 ("PAPCA"), it is prohibited to emit air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act. A violation of the PAPCA constitutes a public nuisance and any person who causes the public nuisance "shall be liable for the cost of abatement." 35 P.S. § 4013.

124.    Pursuant to Ohio Rev. Code § 3704.03, "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

125.    Defendants' acts and omissions caused the trainwreck, fire, intentional ignition of vinyl chloride, and resulting toxic chemical burn pit as alleged above, which emitted impermissible levels of vinyl chloride to be released into the air and properties of Plaintiffs and Class members.

126. As a direct and proximate result of Defendants' conduct alleged herein, Plaintiffs and the Class members, and each of their properties, have been exposed to hazardous air pollutants in violation of Pennsylvania, Ohio, and federal law.

127. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members have suffered injury and damages as stated above in an amount to be proven at trial, including, without limitation, property damage, diminution of value of real estate, the cost to clean and repair the damage and restore their property to its previous condition, the cost of recovering possession of the property, and the value of their lost use of the property as a result of Defendants' conduct.

128. Defendants acted maliciously and recklessly, with aggravated or egregious fraud, and/or with intentional disregard for the rights of Plaintiffs and the Class so as to warrant imposing punitive damages.

## COUNT VII
## WANTON AND WILLFUL MISCONDUCT

129. Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

130. At all times relevant hereto, Defendants owed a duty to Plaintiffs and the Class to refrain from wanton, willful, and outrageous misconduct.

131. Defendants were aware that they were transporting substances that were highly toxic and carcinogenic to human beings and dangerous to the environment, and that igniting such chemicals could result in unreasonably dangerous emissions of hazardous and toxic materials into the surrounding areas.

132. Defendants knew or should have known that at least one railcar was malfunctioning and/or was on fire for at least 20 miles before the derailment.

133.     Despite its knowledge, and contrary to federal and standard industry practices and procedures, Defendants breached their duties as described in Count I above.

134.     Through their conduct as alleged herein, Defendants failed to exercise care toward Plaintiffs and the Class, to whom Defendants owed a duty of reasonable care.

135.     Defendants' willful, wanton, reckless, intentional, and/or outrageous conduct demonstrates a deliberate indifference to the health, safety and well-being of Plaintiffs and the Class.

136.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members have suffered injury and damages as stated above in an amount to be proven at trial, including, without limitation, property damage, diminution of value of real estate, the cost to clean and repair the damage and restore their property to its previous condition, the cost of recovering possession of the property, and the value of their lost use of the property as a result of Defendants' conduct.

137.     Defendants acted maliciously and recklessly, with utter indifference and conscious disregard for the health, safety, well-being and rights of Plaintiffs and the Class so as to warrant imposing punitive damages.

### COUNT VIII:
### INDUCING PANIC THROUGH DISORDERLY CONDUCT UNDER
### Ohio Rev. Code §§ 2307.60, 2917.31, and 2917.11

138.     Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

139.     Ohio Rev. Code § 2917.31(A)(3) provides that "[n]o person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by doing any of the following: . . . [c]ommitting any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm."

140. Ohio Rev. Code § 2917.11(A)(4) prohibits "[h]indering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender."

141. Ohio Rev. Code § 2917.11(A)(5) prohibits "[c]reating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender."

142. Through their conduct as alleged herein, Defendants induced panic through disorderly conduct.

143. Defendants had no lawful or reasonable purpose in derailing the train.

144. Defendants had no lawful or reasonable purpose in releasing and igniting toxic chemicals into the environment.

145. Under Ohio Rev. Code § 2307.60(A)(1), "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code."

146. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class members have suffered injury and damages as stated above in an amount to be proven at trial, including, without limitation, property damage, diminution of value of real estate, the cost to clean and repair the damage and restore their property to its previous condition, the cost of recovering

possession of the property, and the value of their lost use of the property as a result of Defendants' conduct.

147.    Defendants acted maliciously and recklessly, with utter indifference and conscious disregard for the health, safety, well-being and rights of Plaintiffs and the Class so as to warrant imposing punitive damages.

**COUNT IX:**
**MEDICAL MONITORING**

148.    Plaintiffs incorporate here all preceding paragraphs as if fully set forth herein.

149.    As a result of Defendants' conduct as alleged herein, Plaintiffs and the Class were significantly exposed to toxic chemicals and pollutants, including known carcinogens, that are proven to be hazardous to health.

150.    The exposure to these dangerous substances is such that Plaintiffs and the Class have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer, and as such, require medical monitoring which Defendants are responsible for providing and paying for.

151.    Monitoring and testing procedures for cancer and other illnesses associated with exposure to the toxic chemicals at issue in this Complaint exist which make the early detection and treatment of disease possible and beneficial.

152.    As a result, Plaintiffs request that the Court establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs and the Class for their economic damages associated with medical monitoring.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, request judgment against Defendants as follows:

A.  For an order certifying the Class, as defined above, appointing Plaintiffs as representatives of the Class, and appointing the undersigned counsel for Plaintiffs as counsel for the Class;

B.  For all recoverable compensatory, statutory, and other damages, including, without limitation, (i) clean-up and remediation costs; (ii) loss of use of property; (iii) loss and diminution of property value; (iv) all economic costs associated with a medical monitoring program to be established for the continual screening and detection of illnesses, diseases, or disease processes necessitated by exposure to toxic chemicals alleged above; and (v) all other economic damages and out-of-pocket costs sustained by Plaintiffs and the Class, including all relief allowed under applicable laws;

C.  Declaratory judgment that Defendants are responsible for all past and future costs to remedy the harms caused to Plaintiffs and the Class, and their properties;

D.  For payment of attorneys' fees and expenses as may be allowable under applicable law;

E.  For pre-judgment and post-judgment interest on any amounts awarded;

F.  For punitive damages, according to proof;

G.  For injunctive and declaratory relief, as allowed by law; and

H.  All such further relief as this Court may deem just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 1, 2023                           Respectfully submitted,


By:  ___/s/ Daniel Karon_____

Daniel Karon (0069304)
**KARON LLC**
700 West St. Clair Avenue, Suite 200
Cleveland, OH 44113
Telephone: (216) 622-1851
Facsimile: (216) 241-8175
dkaron@karonllc.com


Shanon J. Carson*
Lane Vines*
Dena R. Young*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604
scarson@bm.net
lvines@bm.net
dyoung@bm.net

*Attorneys for Plaintiffs*

*Applications to appear *pro hac vice* to be filed